UNITED STATES  DISTRICT COURT

Northern District of California

San Francisco Division

KENNISON WAKEFIELD, et al.,

Plaintiffs,

v.

WELLS FARGO & COMPANY, et al.,

Defendants.

_____/

No. C 13-05053 LB

**ORDER GRANTING DEFENDANTS'**
**MOTION FOR PARTIAL SUMMARY**
**JUDGMENT**

[Re: ECF No. 46]

## INTRODUCTION

Plaintiffs Kennison Wakefield and William Stonhaus are financial advisors who left Wells Fargo to work for competing financial services firms.  When they left, they had money in deferred compensation plans.  The plans' terms provided that when financial advisors leave, they forfeit unvested deferred compensation unless they (1) meet certain age and service requirements, (2) agree to a non-compete agreement lasting three years, and (3) in fact do not compete against Wells Fargo for three years.  Plaintiffs met the age and service requirements but lost their unvested deferred compensation because they left to work for competitors.  When they left to work for the competitors, they knew – thanks to Wells Fargo's explicit practices about its plans – that the deferred-compensation plans required forfeiture of their unvested deferred compensation.

Plaintiffs sued Wells Fargo on behalf of themselves and similarly-situated financial advisors who worked in California or North Dakota, alleging that the forfeiture violated California and North Dakota statutes that prohibit unlawful restraints of competition.  *See* Second Amended Complaint,

1  ECF No. 44 at 18;[1] Cal. Bus. & Prof. Code § 16600; North Dakota Century Code § 9-08-06.

2      The parties settled their case except for the issue of when California's four-year statute of

3  limitations for breach of contract claims begins to run.  *See* Cal. Civ. Code § 3426.4.  Wells Fargo

4  contends that it begins to run when the financial advisor learns of the forfeiture.  *See* Motion, ECF

5  No. 4 at 16.  Plaintiffs counter that Wells Fargo knew that the forfeiture provision was illegal and

6  concealed the illegality by drafting a plan that looked legitimate and by representing that it was

7  legitimate.  They assert that their reasonable reliance on Wells Fargo's misrepresentations tolled the

8  statute of limitations until November 2011, when Mr. Wakefield learned from an attorney who he

9  consulted on a different matter that the forfeiture was illegal.  *See* Opposition, ECF No. 57 at 22-23.

10  The effect of the parties' disagreement is that if Wells Fargo is right, the statute of limitations bars

11  recovery for financial advisors such as Mr. Stonhaus who had their deferred compensation forfeited

12  before September 26, 2009.

13      Upon consideration of the papers submitted, the arguments of counsel at the October 2, 2014

14  hearing, and the applicable authority, the court holds that the contract claims accrued at the time of

15  forfeiture and that California's equitable tolling and equitable estoppel doctrines do not change this

16  outcome.  The court thus grants Wells Fargo's motion for partial summary judgment.

17                                              **STATEMENT**

18  **I. THE PARTIES**

19      The named defendants are Wells Fargo & Company and its wholly owned subsidiaries Wells

20  Fargo Advisor, LLC, and Wells Fargo Advisors Financial Network, LLC.  *See* Joint Statement of

21  Undisputed Facts ("JSUF"), ECF No. 49-1 ¶ 1.  Predecessor corporations acquired directly or

22  indirectly by Wells Fargo & Company include Wachovia Corporation and its affiliates Wachovia

23  Securities Inc./Wachovia Securities, LLC and Wachovia Securities Financial Holdings, LLC, A.G.

24  Edwards, Inc., and its subsidiary, A.G. Edwards & Sons, Inc.[2]  *Id.*  The parties refer collectively to

25

26          [1]  Citations are to the electronic case file ("ECF") with pin cites to the electronically-
27  generated page numbers at the top of the page.

28          [2] Effective December 31, 2008, Wachovia Corporation merged with and into Wells Fargo &
    Company.  JSUF, ECF No. 49-1 ¶ 2.  Wachovia Securities, LLC changed its name to Wells Fargo

these entities as "Wells Fargo."

Both plaintiffs worked as financial advisors ("FAs") for Wachovia Securities, which merged with and into Wells Fargo effective December 31, 2008, and it is undisputed that both meet the age and service requirement for disbursements under the deferred-compensation plan. *Id.* ¶¶ 3-4. The relevant plaintiff for the statute of limitations issue is Mr. Stonhaus because he left Wachovia to work at competitor UBS Financial Services in October 2008, more than four years before the complaint that was filed on September 26, 2013. *Id.* ¶ 4. The parties agree that California Civil Procedure Code § 337's four-year statute of limitations is the applicable statute of limitations, and unless the limitations period did not begin to accrue until November 2011, or unless it was tolled, Mr. Stonhaus's claim is time-barred. (Mr. Wakefield left Wells Fargo in October 2011 and is not affected by the statute of limitations. *Id.* ¶ 3.)

## II. THE DEFERRED COMPENSATION PLANS

Wells Fargo has had deferred-compensation plans for its financial advisors since 1983, when its predecessor A.G. Edwards Inc. established the earliest plan. *Id.* ¶ 8. The relevant plans are the Voluntary Deferral and Performance Award Contribution Plan and the Performance Award Contribution Plan, both effective January 1, 2005. *Id.* ¶ 10; Martz Decl., ECF No. 46-2 ¶ 3 & Ex. C. The plans were amended several times, with amendments effective on January 1, 2006, January 1, 2008, January 1, 2009, January 1, 2010, and January 1, 2010. JSUF, ECF No. 49-1 ¶ 11-15. As part of the 2010 amendment, they were renamed the "Wells Fargo Advisors, LLC Performance Award Contribution Plan" and the "Wells Fargo Advisors, LLC Performance Award Contribution and Deferral Plan." *Id.* ¶ 14. The plans are nationwide plans that apply to FAs employed by Wells Fargo or its predecessors in all states, not just California and North Dakota. *Id.* ¶ 16.

The Plans provide for "Performance Awards" (hereinafter, "Awards") that are credited to an FA's account if the FA meets pre-established performance goals. *Id.* ¶ 17. The Awards are designed to "serve as a meaningful incentive" for financial advisors to keep working for Wells Fargo. *Id.* The renamed-in-2010 "Wells Fargo Advisors, LLC Performance Award Contribution

---

Advisors, LLC effective May 1, 2009. *Id.* Wells Fargo Advisors, LLC is 100% owned by Wachovia Securities Financial Holdings, LLC. *Id.*

1   and Deferral Plan" states that it is designed "to provide a select group of management and other

2   highly compensated employees. . . with the opportunity to defer a portion of their incentive-based

3   compensation each year . . . and to earn additional incentive compensation contingent upon their

4   attainment of pre-established performance objectives and their completion of designated service

5   periods." *Id.* ¶ 18; *see* ECF No. 46-3 at 23. § 11.04 (Wachovia Securities' January 1, 2005 plan has

6   similar language).

7          The Plans provide for a vesting schedule, and subject to the conditions stated in the Plans, for the

8   payment of vested benefits upon retirement, termination of employment, disability or death.  JSUF,

9   ECF No. 49-1 ¶ 19.  The Plans are unfunded, payments under them are from Wells Fargo's general

10  assets, and participating FAs are unsecured creditors.  *Id.* ¶ 20.  The Performance Awards are

11  credited annually to each participating FA's Plan Award account and include accrued appreciation

12  and losses.  *Id.* ¶¶ 22-23.  Wells Fargo's Executive Vice President of Compensation and Benefits has

13  represented in sworn testimony that the Long-Term Incentive Compensation Plan is not an employee

14  benefit plan.  *Id.* ¶ 21.  The Plans say that they are unfunded deferred compensation plans construed,

15  administered, and governed under the Employee Retirement Income Security Act of 1974

16  ("ERISA").  *See* ECF 46-3, § 11.04.

17         First Union Bank and/or Skycomp administer the Awards and permit Plaintiffs and other FAs to

18  access electronically their account balances and transaction history.   JSUF, ECF No. 49-1 ¶ 24.

19  Copies of the Plan and Plan prospectus could be obtained by request to the companies' executive

20  compensation departments or via a deferred-compensation website.  *Id.* ¶ 30.  Plaintiffs and other

21  FAs could obtain Plan documents, including the official summary and prospectus for the Plans, by

22  email.  *Id.*

23         Wells Fargo applied all of the provisions in the Plans throughout the past 30 years and at least

24  every year explained in writing to all FAs how the Plans worked.  *Id.* ¶ 25.  Wells Fargo had

25  automated voice response services for questions, and Plan representatives answered questions about

26  the provisions of the Plans.  *Id.*  All responses would repeat or paraphrase the contents of the

27  provisions in the Plans and the Summary Plan descriptions.  *Id.*  Wells Fargo also published at least

28  annually a brochure containing a summary plan description of the Plans in which Wells Fargo

provided further information about the Plans to FAs.  *Id.*  The brochures explaining the Awards were designed to summarize and/or provide information about the Plans.  *Id.* ¶ 26.  Many of the Summary Plan descriptions are titled "Understanding Your Award."  *Id.* ¶ 25; *see also id.* ¶ 26 (listing the titles of many of these descriptions).  In 2007 and 2008, FAs, including both named plaintiffs, were provided copies of Wachovia Compensation Plans that described the types of compensation that they were paid and/or for which they could qualify.  *Id.* ¶ 27.

Under the Plans, an FA forfeits non-vested deferred compensation when the FA's employment with Wells Fargo terminates, unless the FA meets the conditions set forth in the Plan for "Retirement" and any other related conditions, in which case the FA's Awards continue to vest.  *Id.* ¶ 32.  Awards vest, if at all, under the schedule and conditions set out in the Plans.  *Id.* ¶ 33.  Under the Plans, Awards vest so long as an FA continues employment at Wells Fargo or qualifies for "Retirement," subject to the conditions of the Plans.  *Id.* ¶ 34.

Until January 2012, an FA qualified for "Retirement" under the Plans and continued vesting if the FA (1) satisfied the "Rule of 60" (meaning, the FSA reached age 50 and had at least three years of service with Wells Fargo, and the sum of the FA's age and years of service was at least 60), (2) agreed to a non-compete agreement lasting three years, (3) did not compete against Wells Fargo for three years, and (4) after January 2009, signed a release.  *Id.* ¶ 35.  That release is titled "Acknowledgement, Certification and Release Regarding Continued Vesting of Awards," and paragraph 1 states that if the FA is in violation of any of these requirements—including the agreement not to compete against Wells Fargo for three years—the FA's unvested Awards will be immediately forfeited.  *Id.* ¶ 36.  The release also provides that the FA has had the opportunity to consult with an attorney before execution.  *Id.* ¶ 37.  If the FA qualified for "Retirement" and satisfied all of the related conditions in the plan, then the FA's awards would vest and/or continue to vest pursuant to the Plans.  *Id.* ¶ 38.

Wells Fargo restated its Plans as of January 1, 2012 to waive requirements about forfeiture for California and North Dakota FAs who leave to work for a competitor and who otherwise qualify for continued vesting of their Awards under the Plans.  *Id.* ¶ 39.  Wells Fargo has not sent any written notice to presently-employed FAs to explain this change to the Plans.  *Id.*  It has not sent any written

notice or explanation about this change to California or North Dakota FAs who satisfied the Rule of 60 for continued vesting and whose unvested account balances were previously forfeited under the prior versions of the Plans during the past 30 years. *Id.* Except for providing a copy of the revised Plans and the revised Summary Plan description, Wells Fargo has not sent notices or communicated about this change to FAs throughout the United States. *Id.* It did not provide a written explanation or any information about the Plan changes or the effect of those changes (other than a copy of the Restated Plan and the brochure about the Restated Plan) to California or North Dakota FAs who went to work for a competitor after January 1, 2012. *Id.* ¶ 40.

### III. THE FORFEITURE OF PLAINTIFFS' ACCOUNTS

During the period from March 31, 2005, through October 26, 2012, Wells Fargo forfeited under the Plans' forfeiture provision the Awards accounts of 138 California and North Dakota FAs. *Id.* ¶ 62. The total market value of those accounts was $12,536,149.31. *Id.*

Mr. Stonhaus left Wells Fargo in October 2008 and went to work for competitor UBS Financial Services. *Id.* ¶ 47. The market value of his Awards account was over $690,000. *Id.* Also at that time, Mr. Stonhaus requested his Awards and was told by Wells Fargo's Compensation Department Executive that his Awards had been forfeited because he was employed by the competition and that he was not entitled to any of the Awards under the terms of the Plans. *Id.* When Wells Fargo forfeited Mr. Stonhaus's Award on October 22, 2008, it added a detail to his online "Transaction History" stating "Reason: Forfeit – Competing." *Id.* ¶¶ 49-50. In addition to electronic access to his account, Mr. Stonhaus had the option of having hard copy statements containing his Award account balance sent to his home address on a quarterly basis, even after he left Wells Fargo. *Id.* ¶ 51.

When Mr. Wakefield left Wells Fargo to work for Morgan Stanley, a competitor of Wells Fargo, in October 2011, the market value of his Award account balance was $177,290.74. *Id.* ¶ 45. Wells Fargo thereafter forfeited all of his unvested account balance and sent to him his Award account summary for the period October 1, 2011 to December 30, 2011. *Id.* The account summary showed a zero balance as of December 30, 2011. *Id.*

When they left Wells Fargo, both Plaintiffs met the "Rule of 60" age-plus-service requirement of the Plans because both were over 50 years old, had worked at least three years for Wells Fargo, and

had combined years of continuous service and age over 60. *Id.* ¶ 52. During their employment with Wells Fargo, Plaintiffs and other FAs were informed repeatedly about the Rule of 60, but their unvested Award account balances would be forfeited by Wells Fargo if they left Wells Fargo to work for a competitor in the financial services industry. *Id.* ¶ 53.

Both named plaintiffs acknowledged that they knew that they would forfeit their unvested accounts if they qualified under the Rule of 60, left Wells Fargo, and did not sign an agreement that they would not compete (and in fact, did not compete) for three years. *See* Stonhaus Decl., ECF No. 51 ¶ 6; Wakefield Decl., ECF No. 52 ¶ 6. Both said that they did not think this was unusual and believed that Wells Fargo had the right to keep the money that they had earned in their Award account if they worked for competitors at any time during the three years after they left. *See* Stonhaus Decl., ECF No. 51 ¶ 6; Wakefield Decl., ECF No. 52 ¶ 6. Both believed that this was reasonable and a standard part of their total compensation package and believed and expected that the provision for forfeiture would be enforced and applied to all employees. *See* Stonhaus Decl., ECF No. 51 ¶ 6; Wakefield Decl., ECF No. 52 ¶ 6. Both believed the money belonged to Wells Fargo after they left to work for a competitor, did not think that there was anything wrong or illegal about the forfeiture of the money, and did not suspect or have reason to suspect that the forfeited Awards were rightfully theirs and that Wells Fargo had no right to take them. *See* Stonhaus Decl., ECF No. 51 ¶ 7; Wakefield Decl., ECF No. 52 ¶ 7.

Both said that Wells Fargo, through the plan documentation and managers' statements, represented that the Plans were "official" and part of the authorized legitimate compensation package for Financial Advisors. *See* Stonhaus Decl., ECF No. 51 ¶ 8; Wakefield Decl., ECF No. 52 ¶ 7. The company presented the Plans as part of a special compensation package that it had invested time in preparing and that were better than other companies' programs. *See* Stonhaus Decl., ECF No. 51 ¶ 8. Management said that the Plans were based on the company's overall goal and vision and that they had been reviewed carefully by the company, all its internal managers, the staff and executives in Human Resources, and the company's compensation advisors. *See id.* No one ever said (either during their employment or when they left) that the Awards were really theirs and that Wells Fargo was not entitled to keep them if they left to work for a competitor. *See*

1   Stonhaus Decl., ECF No. 51 ¶ 8; Wakefield Decl., ECF No. 52 ¶ 7.  This was standard business

2   practice, they believed that the Award program was legitimate and officially approved by the

3   company, and they relied on the company's management and statements and conduct and believed

4   that the company expected all FAs to believe that the company and its compensation program were

5   valid and honest.  Stonhaus Decl., ECF No. 51 ¶¶ 8-9; Wakefield Decl., ECF No. 52 ¶ 7.  The

6   company emphasized that its goal was to be the most trusted financial service firm in America and

7   the best place for FAs to work and grow, and they believed that the company had good, honest, and

8   experienced compensation and human resource advisors.  Stonhaus Decl., ECF No. 51 ¶ 10;

9   Wakefield Decl., ECF No. 52, ¶ 10.  When they left, Human Resources executives told them that

10  they were not entitled to their unvested Awards.  Stonhaus Decl., ECF No. 51 ¶ 11; Wakefield Decl.,

11  ECF No. 52 ¶¶ 6, 15.

12      Mr. Stonhaus did not believe that there was any reason to get legal or human resources advice

13  because he trusted the company and thought the compensation program was legitimate and honest

14  and better than industry standards.  Stonhaus Decl., ECF No. 51 ¶ 13.  Because he believed the

15  company had been honest and would not cheat or deceive its FAs or misrepresent what was

16  officially stated in the compensation programs, he had no reason to suspect that the company's

17  conduct was not fair, honest, or above board or that it was not consistent with legitimate

18  compensation practice and programs or good business practice.  *Id.* ¶ 14.  He was shocked when he

19  learned that Wells Fargo was not entitled to take his Awards, and he was ignorant of this because he

20  had relied on the company's many representations and statements, the company culture and vision,

21  and all of the official compensation program, including the Plan and related documents saying that

22  company could keep the unvested Awards if he left to work for a competitor.  *Id.* ¶ 15.

23      When Mr. Wakefield left the company, he was told that he must sign a release to receive any

24  compensation he was owed.  Wakefield Decl., ECF No. 52 ¶ 16.  He did not believe he was owed

25  any money and did not sign the release.  *Id.*  He did not discuss the issue with a lawyer until October

26  2011, when he had another dispute with Wells Fargo.  *Id.*  He did not believe that there was any

27  reason to get legal advice because he trusted Wells Fargo to do what was right, believed it was

28  honest and ethical, and thought that the Plans' provisions were legitimate and standard

UNITED STATES DISTRICT COURT
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

1   compensation practice and policy.  *Id.*  Because of his reliance on Wells Fargo's culture and

2   representations, he did not learn that Wells Fargo had taken his money wrongfully until he consulted

3   a lawyer on the other dispute he had with Wells Fargo. *Id.* ¶¶ 17-18.

4       Boiled down, Plaintiffs contend that Wells Fargo deliberately presented the forfeiture agreement

5   as legal.  To show this, they emphasize that Wells Fargo never told them that the agreement was

6   unlawful but instead passed it off as a proper part of the Plans and discussed it in brochures designed

7   to conceal its illegality.  *See* Wakefield Decl., ECF No. 50 ¶ 7; Stonhaus Decl., ECF No. 51 ¶¶ 8-10;

8   Edlund Decl., ECF No. 52 ¶¶ 9-11.  They also say that Wells Fargo made public statements about its

9   high ethical standards generally and about how Wells Fargo maintains an ethics policy for its

10  employees.  *See* Wakefield Decl., ECF No. 50 ¶ 11-14; Stonhaus Decl., ECF No. 51 ¶ 10.  In sum,

11  Plaintiffs say that they trusted Wells Fargo and had no idea that the forfeiture agreement was

12  unlawful.  *See* Wakefield Decl., ECF No. 50 ¶¶ 6, 8; Stonhaus Decl., ECF No. 51 ¶¶ 7, 9, 15.

13  **IV.  WELLS FARGO'S LEGAL KNOWLEDGE**

14      Plaintiffs contend that Wells Fargo knew that forfeiting the Awards was unlawful under

15  California and North Dakota law but did it anyway.  To show this, they provide evidence that Wells

16  Fargo has been a client of six large law firms during the last ten years and that those law firms have

17  produced, and made available on their websites, newsletters, legal alerts, and legal articles regarding

18  the illegality of non-compete provisions under California law.  *See* Edlund Decl., ECF No. 52 ¶¶ 16-

19  20.  They also state that Wells Fargo has over 390 in-house attorneys and those attorneys are

20  expected to read publications produced by the California Bar, some of which state that non-compete

21  provisions often are unlawful under California law.  *See id.* ¶¶ 24-25.  They mention Wells Fargo's

22  membership in the Association of Corporate Counsel for over 15 years.  *Id.* ¶ 41.  That organization

23  publishes articles on subjects relevant to corporate counsel including a presentation in September

24  2008 on practical advice for enforcing non-compete clauses and other restrictive covenants.  *Id.* ¶

25  42.  **V.  THE COMPLAINT**

26      After consulting a lawyer in October 2011 regarding another matter involving Wells Fargo, Mr.

27  Wakefield learned that he might have a legal claim regarding the forfeiture of his award.  On

28  September 26, 2013, he filed the original complaint in Alameda County Superior Court.  *See*

1   Original Complaint, ECF No. 1-1; Wakefield Decl., ECF No. 50 ¶ 18.  He alleged nine claims: (1)

2   violation of California Business & Professions Code § 16600; (2) violation of California Civil Code

3   § 52.1; (3) violation of California Labor Code § 206.5; (4) interference with prospective economic

4   advantage; (5) book account; (6) constructive trust; (7) fraud; (8) breach of contract; and (9)

5   conversion.  *See* Original Complaint, ECF No. 1-1 ¶¶ 49-98.  On October 17, 2013, he filed a First

6   Amended Complaint ("FAC") that amended his first claim to include a violation of North Dakota

7   Century Code § 9-08-06 in addition to the violation of California Business & Professions Code §

8   16600.  *See* FAC, ECF No. 1-2 ¶¶ 49-55.

9        On October 29, 2013, Wells Fargo removed the action to this court, asserting that Mr.

10   Wakefield's claims are completely preempted by ERISA, 29 U.S.C. §§ 1001-1461, and that the

11   court has federal question jurisdiction for this reason.  *See* Notice of Removal, ECF No. 1 at 2-4.

12   Mr. Wakefield moved to remand, arguing that the claims are not subject to ERISA preemption and

13   therefore the court lacks federal question jurisdiction.  *See* Motion to Remand, ECF No. 12.

14   **VI.  SETTLEMENT SUBJECT TO MOTION REGARDING STATUTE OF LIMITATIONS**

15        By stipulation, the parties deferred proceeding on the motion to remand and engaged in

16   settlement negotiations with a private mediator.  On June 19, 2014, they notified the court that Mr.

17   Wakefield would withdraw the motion because the parties had entered into a memorandum of

18   understanding ("MOU") that conditionally settles the case except for the issue of whether the four-

19   year statute of limitations for breach of contract claims bars recovery of the forfeited Awards for

20   putative class members who left Wells Fargo to work for competitors before September 26, 2009.

21   *See* 6/18/2014 Stipulation, ECF No. 37.  The parties agreed that Wells Fargo would file a summary

22   judgment motion "concerning the statute of limitations and its applicability to a portion of the

23   members of the putative class."  *Id.* at 2.

24        The MOU provides for a settlement class of all FAs who had Awards forfeited because they left

25   to work for a competitor.  For FAs who left Wells Fargo before September 26, 2009 (four years

26   before the lawsuit was filed), the amount of their recovery depends on the outcome of the statute of

27   limitations dispute.  If the four-year statute of limitations period did not accrue until October 2011 or

28   was tolled (as Plaintiffs argue), then they receive 89.7% of their forfeited Awards.  If the statute of

**UNITED STATES DISTRICT COURT**
For the Northern District of California

1   limitations period accrued when the Awards were forfeited and is not tolled, then they receive a

2   nuisance value payment of $10,000 each.  This means that Wells Fargo will pay $14,885,179 if the

3   statute of limitations does not bar the claims of those who left before September 26, 2009, and it will

4   pay $7,420,000 if it does.

5        To queue up the partial summary judgment motion, the MOU provides that Mr. Wakefield would

6   submit by stipulation an amendment to the complaint to add a representative plaintiff who was a

7   Wells Fargo FA with an Award that allegedly was illegally forfeited before September 26, 2009

8   because the FA took a job with a competing firm.  As to the scope of Wells Fargo's summary

9   judgment motion, the MOU said that Wells Fargo would file a summary judgment motion "against

10  the new plaintiff on the basis that his or her claim for breach of contract is barred by the pertinent

11  four-year statute of limitations.  Wells Fargo will not base this motion, and plaintiffs will not oppose

12  this motion, on arguments unique to the new plaintiff; instead, Wells Fargo will base this motion,

13  and plaintiffs will oppose it, on grounds common to the putative class whose deferred compensation

14  was allegedly improperly forfeited prior to September 26, 2009 due to competition."

15       In the stipulation, the parties also stated that they "believe and concur that federal jurisdiction

16  pertains to this action under the Class Action Fairness Act [('CAFA')], 28 U.S.C. § 1332(d),"

17  because "the matter in controversy exceeds $5 million, the number of alleged class members is

18  approximately 135, more than two-thirds of the alleged class members are citizens of California, and

19  no defendant from whom significant relief is sought and whose conduct forms a significant basis for

20  the claims of the alleged class is a citizen of California."  *See* 6/18/2014 Stipulation, ECF No. 37 at

21  2-3.  On July 11, 2104, and as the parties agreed in the MOU, Mr. Wakefield filed the operative

22  Second Amended Complaint.  *See* Second Amended Complaint, ECF No. 44.  The Second Amended

23  Complaint adds Mr. Stonhaus as a Plaintiff because he left Wells Fargo outside the four-year statute

24  of limitations period but otherwise does not add or delete any claims.  It also alleges that the court

25  has jurisdiction over this action under CAFA.  *Id.* ¶ 29.

26       On July 22, 2014, Wells Fargo filed the pending motion for partial summary judgment, asking

27  for judgment on "Plaintiff William Stonhaus's Eighth Claim for Relief for Breach of Contract."  *See*

28  Motion, ECF No. 46; Proposed Order, ECF No. 46-14.  Plaintiffs filed their opposition on August 5,

1   2014, and the next day they filed an amended opposition to correct the citations in a footnote.  *See*

2   Amended Opposition, ECF No. 57.  Wells Fargo filed its reply on August 12, 2014.  *See* Reply, ECF

3   No. 58.  The court held a hearing on the matter on October 2, 2014.  *See* 10/2/2014 Minute Order,

4   ECF No. 60.

5                                                    **ANALYSIS**

6   **I. LEGAL STANDARD**

7          The court must grant a motion for summary judgment if the movant shows that there is no

8   genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of

9   law.  Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  Material

10  facts are those that may affect the outcome of the case.  *Anderson*, 477 U.S. at 248.  A dispute about

11  a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for

12  the non-moving party.  *Id.* at 248-49.

13         The party moving for summary judgment bears the initial burden of informing the court of the

14  basis for the motion, and identifying portions of the pleadings, depositions, answers to

15  interrogatories, admissions, or affidavits which demonstrate the absence of a triable issue of material

16  fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  To meet its burden, "the moving party

17  must either produce evidence negating an essential element of the nonmoving party's claim or

18  defense or show that the nonmoving party does not have enough evidence of an essential element to

19  carry its ultimate burden of persuasion at trial."  *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz*

20  *Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000); *see Devereaux v. Abbey*, 263 F.3d 1070, 1076

21  (9th Cir. 2001) ("When the nonmoving party has the burden of proof at trial, the moving party need

22  only point out 'that there is an absence of evidence to support the nonmoving party's case.'")

23  (quoting *Celotex*, 477 U.S. at 325).

24         If the moving party meets its initial burden, the burden shifts to the non-moving party to produce

25  evidence supporting its claims or defenses.  *Nissan Fire & Marine Ins. Co., Ltd.*, 210 F.3d at 1103.

26  The non-moving party may not rest upon mere allegations or denials of the adverse party's evidence,

27  but instead must produce admissible evidence that shows there is a genuine issue of material fact for

28  trial.  *See Devereaux*, 263 F.3d at 1076.  If the non-moving party does not produce evidence to show

UNITED STATES DISTRICT COURT
For the Northern District of California

a genuine issue of material fact, the moving party is entitled to summary judgment. *See Celotex*, 477 U.S. at 323.

In ruling on a motion for summary judgment, inferences drawn from the underlying facts are viewed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## II. APPLICATION

The parties agree that under California law, the applicable statute of limitations for Plaintiffs' breach of contract claim is four years. Cal. Code Civ. P. § 337. The disputed issue are when the limitations period started running, whether it should be tolled, and whether Wells Fargo is estopped from asserting the defense. Wells Fargo says that the limitations period started running the dates the Awards were forfeited. Plaintiffs counter that Wells Fargo concealed that the forfeiture was illegal, which (1) either delays the accrual, or tolls the running, of the statute of limitations until October 2011, when Mr. Wakefield sought legal advice about another matter involving Wells Fargo and learned that the forfeiture was illegal, and (2) estops Wells Fargo from asserting a limitations defense.

The next sections address (A) whether California or federal law applies, (B) whether California's discovery rule delays accrual of the claim, and (C) whether Wells Fargo's conduct equitably tolled the statute of limitations period and estops it from relying on a statute of limitations defense.

### A. California Law Applies Regarding the Statute of Limitations and Any Tolling

The first issue is whether the court applies California law or federal law to decide these issues. Upon consideration of the applicable authorities, the court applies California law.

In diversity actions, a federal court applies the substantive law of the state in which it sits. *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). State statutes of limitations are substantive law for purposes of the *Erie* doctrine. *See Guaranty Trust Co. of New York v. York*, 326 U.S. 99, 110-111 (1945). So are state provisions that are "an integral part" of the statute of limitations. *Walker v. Armco Steel Corp.*, 446 U.S. 740, 751-52 (1980). State laws that affect the tolling, revival, and application of a statute of limitations are "an integral part" of the state limitations statute. *See Hardin v. Straub*, 490 U.S. 536, 539 (1989) (noting that in virtually all statutes of limitations the

UNITED STATES DISTRICT COURT
For the Northern District of California

1    length of the limitations period is interrelated with provisions regarding tolling, revival, and

2    application); *Albano v. Shea Homes Ltd. Partnership*, 634 F.3d 524, 530 (9th Cir. 2011) (district

3    court sitting in diversity applies state statute of limitations and state tolling rules).

4          Plaintiffs allege in their Second Amended Complaint that the court has diversity jurisdiction

5    under CAFA.  Second Amended Complaint, ECF No. 44 ¶ 29; *see* 28 U.S.C. § 1332(d).  And in fact

6    there is CAFA jurisdiction: the parties do not dispute that the number of people in the proposed class

7    exceeds 100, the amount in controversy exceeds $5 million, and jurisdiction is minimally diverse.

8    *See* 28 U.S.C. § 1332(d); *United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. &*

9    *Serv. Workers Intern. Union, AFL-CIO, CLC v. Shell Oil Co.*, 602 F.3d 1087, 1090-91 (9th Cir.

10   2010).  Thus, under *Erie*, the court applies California law to determine what the applicable statute of

11   limitations is, when Plaintiffs' breach of contract claim accrued, whether the limitations period

12   should be equitably tolled, and whether Wells Fargo is be equitably estopped from asserting the

13   statute of limitations as a defense.

14         Plaintiffs nonetheless argue that the court should apply federal law on equitable tolling, saying

15   that they stipulated to CAFA jurisdiction only "for the limited purpose of settlement."  Opposition,

16   ECF No. 57 at 30-31.  Plaintiffs contend that Wells Fargo's removal of the action was based only on

17   alleged ERISA preemption and so it cannot now argue that the *Erie* doctrine applies because this is a

18   diversity action.  *See id.*  But Plaintiffs withdrew their motion to remand, and thus the court never

19   considered whether ERISA does in fact preempt the claims so as to give the court federal-question

20   jurisdiction.  Indeed, that issue remains disputed, and it is Plaintiffs' position that the deferred-

21   compensation agreements here are obviously incentive plans not covered by ERISA.  *See*

22   Opposition, ECF No. 57 at 14 n.5.  Also, Plaintiffs did more than stipulate that the court has CAFA

23   jurisdiction: they allege it in the Second Amended Complaint.  The complaint may be part of their

24   negotiated settlement, but it does not alter the conclusion that the only apparent basis for federal

25   jurisdiction is CAFA diversity jurisdiction.  Plaintiffs provide no authority for concluding that Wells

26   Fargo's invocation of ERISA preemption as a ground for removal (even wrongly) estops it from

27   arguing that the *Erie* doctrine applies.

28         Moreover, applying California law instead of federal law regarding equitable tolling does not

UNITED STATES DISTRICT COURT
For the Northern District of California

1   materially alter the analysis.  Generally speaking, both doctrines recognize that the statute of

2   limitations is tolled during a plaintiff's reasonable reliance on a defendant's misrepresentations.  *See*

3   *infra.*  That is the crux of Plaintiffs' challenge to the application of the four-year statute of

4   limitations to FAs who forfeited Awards before September 26, 2009: their reasonable reliance on

5   Wells Fargo's representations about the appropriateness of the forfeiture of their deferred

6   compensation.  And to the extent that the parties both cite opinions that discuss the federal standard,

7   the court considered the opinions.

8   **B.  The California Discovery Rule Does Not Delay The Accrual of Plaintiffs' Claim**

9       The four-year limitations period starts running when the cause of action accrues.  Cal Code. Civ.

10  P. § 312; *Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal. 4th 797, 806 (Cal. 2005).  "Generally speaking,

11  a cause of action accrues at 'the time when the cause of action is complete with all of its elements.'"

12  *Fox*, 35 Cal. 4th at 806 (quoting *Norgart v. Upjohn Co.*, 21 Cal. 4th 383, 397 (Cal. 1999)).  For

13  breach of contract claims like those here, usually the claim accrues at the time of the breach,

14  "regardless of whether any damage is apparent or whether the injured party is aware of his right to

15  sue."  *Perez-Encinas v. AmerUs Life Ins. Co.*, 468 F. Supp. 2d 1127, 1134 (N.D. Cal. 2006) (Breyer,

16  J.) (citing *Neel v. Magana, Olney, Levy, Cathcart & Gelfand*, 6 Cal. 3d 176, 187 (Cal. 1971)).  "The

17  plaintiff's ignorance of the cause of action, or of the identity of the wrongdoer, does not toll the

18  statute."  *Neel*, 6 Cal. 3d at 187 (footnote omitted).

19      Nonetheless, an exception to the "general rule of accrual is the 'discovery rule,' which postpones

20  accrual of a cause of action until the plaintiff discovers, or has reason to discover, the cause of

21  action."  *Fox*, 35 Cal. 4th at 806 (citing *Norgart*, 21 Cal. 4th at 397; *Neel*, 6 Cal.3d at 187).  In

22  several opinions over the past forty years, the California Supreme Court has articulated a standard

23  for the application of the discovery rule, at least in the tort context.  *See generally Fox*, 35 Cal. 4th

24  797 (Cal. 2005); *Norgart*, 21 Cal. 4th 383; *Bernson v. Browning-Ferris Indus.*, 7 Cal. 4th 926 (Cal.

25  1994); *Jolly v. Eli Lilly & Co.*, 44 Cal. 3d 1103 (Cal. 1988); *Gutierrez v. Mofid*, 39 Cal. 3d 892 (Cal.

26  1985); *Sanchez v. South Hoover Hosp.*, 18 Cal. 3d 93 (Cal. 1976).  As the California Supreme Court

27  explained:

28          A plaintiff has reason to discover a cause of action when he or she "has reason at
           least to suspect a factual basis for its elements."  Under the discovery rule, suspicion

UNITED STATES DISTRICT COURT
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

1
2
3
4
5

> of one or more of the elements of a cause of action, coupled with knowledge of any remaining elements, will generally trigger the statute of limitations period. *Norgart* explained that by discussing the discovery rule in terms of a plaintiff's suspicion of "elements" of a cause of action, it was referring to the "generic" elements of wrongdoing, causation, and harm. In so using the term "elements," we do not take a hypertechnical approach to the application of the discovery rule. Rather than examining whether the plaintiffs suspect facts supporting each specific legal element of a particular cause of action, we look to whether the plaintiffs have reason to at least suspect that a type of wrongdoing has injured them.

6   *Fox*, 35 Cal. 4th at 806 (internal citations omitted).

7       In all of the California Supreme Court opinions, the Court considered how and when the

8   discovery rule delayed the accrual of underlined tort claims: *Fox* (products liability claim); *Norgart* (wrongful

9   death); *Bernson* (defamation); *Jolly* (products liability); *Gutierrez* (medical malpractice); *Sanchez*

10  (medical malpractice). It has not considered how and when the discovery rule delays the accrual of

11  a underlined breach of contract claim (or if it even does).

12      The California Courts of Appeal have extended the discovery rule to claims involving the breach

13  of a fiduciary relationship and to "nearly every conceivable action for professional malpractice."

14  *See April Enters., Inc. v. KTTV*, 147 Cal. App. 3d 805, 827, 829 (Cal. Ct. App. 1983). But they have

15  extended the discovery rule rarely, and only in narrow circumstances, to breach of contract claims.

16  *See id.* at 828-833; *Gryczman v. 4550 Pico Partners, Ltd.*, 107 Cal. App. 4th 1 (Cal. Ct. App. 2003).

17  Indeed, "[t]raditionally . . . the discovery rule had not been held applicable to breach of contract

18  actions except in cases involving fraud or misrepresentation." *Perez-Encinas*, 468 F. Supp. 2d at

19  1134 (citing *Watts v. Crocker-Citizens Nat'l Bank*, 132 Cal. App. 3d 516, 523 (Cal. Ct. App. 1982)

20  (misrepresentation); *Balfour, Guthrie & Co. v. Hansen*, 227 Cal. App. 2d 173, 189 (Cal. Ct. App.

21  1964) (fraud)); *accord Greenberg v. Riversource Life Ins. Co.*, No. C 12-00552 WHA, 2012 WL

22  3257667, at *3 (N.D. Cal. Aug. 8, 2012) (rejecting Plaintiff's citation to *Jolly* in a case alleging

23  breach of contract because *Jolly* was a personal-injury action and instead applying the standard in

24  *April* and *Gryczman*); *see also El Pollo Loco, Inc. v. Hashim*, 316 F.3d 1032, 1039-40 (9th Cir.

25  2003) (applying—without addressing the applicability of the California Supreme Court

26  opinions—the standard in *April* to determine whether the discovery rule delayed the accrual of the

27  plaintiff's breach of contract claim).

28      In *April*, a producer of a television program sued the television station after it erased videotapes

of a show that the producer had a right to syndicate.  *See* 147 Cal. App 3d at 813-15.  The station

had exclusive custody and control over the videotapes, and the producer did not learn that they had

been erased until years later, after the statute of limitations presumably had run.  *See id.* at 814-15.

The issue was whether the cause of action accrued when the tapes were erased or when the producer

discovered the erasure.  The court found a limited exception to the general rule that a contract claim

accrues upon breach and held that "the discovery rule may be applied to breaches which can be, and

are, committed in secret and, moreover, where the harm flowing from those breaches will not be

reasonably discoverable by plaintiffs until a future time."  *Id.*  at 832.

In reaching that conclusion, the court analyzed cases where courts applied the discovery rule and

identified the common thread running through them: (1) the injury, the act causing the injury, or

both, were difficult for the plaintiff to detect; (2) the defendant in most instances was in a far

superior position to comprehend the act and the injury; and (3) the defendant in many instances had

reason to believe that the plaintiff remained ignorant that he was wronged.  *Id.* at 831; *accord*

*Gryczman*, 107 Cal. App. 4th. at 5-6.  Even though the application of the discovery rule was not

triggered by deliberate concealment or a heightened duty to the plaintiff, it applied nonetheless

because (1) plaintiffs should not suffer when "circumstances prevent them from knowing they have

been harmed," and (2) courts should not allow defendants to "knowingly profit from their injuree's

ignorance." *April*, 147 Cal. App 3d at 831; *accord Gryczman*, 107 Cal. App. 4th. at 5-6.  Moreover,

holding that the claim accrued when the station erased the tapes would create an expectation that "a

contracting party in such situations has a duty to continually monitor whether the other party is

performing some act inconsistent with one of many possible terms in a contract."  *April*, 147 Cal.

App 3d  at 832.  A duty to monitor, the court reasoned, "is especially onerous when the breaching

party can commit the offending act secretly, within the privacy of its own offices."  *Id.*

Twenty years later, the same court of appeal revisited and reaffirmed the *April* decision.  *See*

*Gryczman*, 107 Cal. App. 4th. at 5-6.  Gryczman had a contractual right of first refusal to buy real

property from the property owner on the same terms contained in any bona fide offer from a third

party that the owner was willing to accept.  *See* 107 Cal. App. 4th at 3-4.  The owner sold the

property without giving Gryczman the contractually-required notice that the right of first refusal had

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

1   been triggered. *Id.* at 4.  More than four years later, Gryczman learned that the property had been

2   sold when he drove past the property, and he sued for breach of contract. *Id.*  Applying *April*, the

3   court found an even stronger case for applying the delayed discovery rule, given that the owner not

4   only breached the contract in the privacy of its own offices but also committed "the act that

5   constituted the breach—failure to give notice of the option offer—[which] was the very act which

6   prevented [the] plaintiff from discovering the breach." *Id.*  The act causing the injury would be

7   difficult for the plaintiff to detect because "the failure to give [the] plaintiff notice of the happening

8   of a certain event is both the act causing the injury and the act that caused [the] plaintiff not to

9   discover the injury." *Id.*  Moreover, the property owner had reason to belief that Gryczman

10  remained ignorant that he had been wronged because it conceded that it never provided the plaintiff

11  with notice of the option offer. *Id.*

12      Wells Fargo's open inclusion and enforcement of an allegedly illegal anti-competition agreement

13  in the Plans was not a "secret breach" like those in *April* and *Gryczman*.  Mr. Stonhaus had access to

14  the Plans, knew about Plans's requirements with respect to the Awards (including the forfeiture

15  agreement), knew that he did not receive his Award when he left Wells Fargo to work for a

16  competitor, and knew that Wells Fargo forfeited his Award pursuant to the forfeiture agreement for

17  that reason.  Wells Fargo did not hide its application of the forfeiture agreement or the forfeiting of

18  the award.  Unlike *April* and *Gryczman*, the alleged breach was not difficult to detect.  *See Perez-*

19  *Encinas*, 468 F. Supp. 2d at 1135 (finding *April*'s holding inapplicable where "Defendants did

20  nothing to hide, mask, or keep secret the terms of the [contract], which were well-known and

21  available in written form to the parties involved").  There are no details hidden in the complexity of

22  documents.  *Cf. Boschma v. Home Loan Center*, 198 Cal. App. 4th 230, 249-250 (2011).  Indeed, the

23  forfeiture provision is explicit, and the "harm flowing from" Wells Fargo's application of the

24  forfeiture agreement was discoverable immediately when Mr. Stonhaus left Wells Fargo's employ.

25  *See April*, 147 Cal. App 3d at 832.

26      Plaintiffs argue that they did not know they had a legal claim until October 2011, when Mr.

27  Wakefield saw a lawyer regarding a different matter involving Wells Fargo and learned of his claim.

28  That does not alter the outcome here.  It is the discovery of facts, not their legal significance, that

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

starts the statute of limitations.  *See Jolly*, 44 Cal. 3d at 1113.  It is irrelevant that a plaintiff is

ignorant of his legal remedy or the legal theories underlying his cause of action. *See Gutierrez*, 39

Cal. 3d 898.   In *Sanchez v. Compania Mexicana de Aviacion S.A.*, the Ninth Circuit (albeit in an

unpublished opinion) addressed Sanchez's argument that an airline breached its contract with her by

allegedly charging and collecting an unlawful Mexican tax.  *See* 361 Fed. Appx. 751, 752 (9th Cir.

2010).  Sanchez brought her claim after California's four-year statute of limitations ran on her

contract claim and argued that the discovery rule should delay the accrual of her claim.  *See id.*

Citing *Gryczman* and *April*, the court rejected the argument, holding that "Mexicana did not charge

Sanchez for the tax in secret (it was listed as a separate item on her ticket) and Sanchez reasonably

could have discovered the alleged unlawful conduct before the statute of limitations expired."  *Id.*

Plaintiffs nonetheless argue that what happened here is different than a standard breach of a

simple contract, where discovery of the facts is enough to provide notice of the claim, and instead

involves Wells Fargo's superior position to comprehend the forfeiture provision's illegality.  Wells

Fargo did more than breach a contract, Plaintiffs argue, and instead – knowing that the forfeiture

provision was void – made the deferred-compensation plan and forfeiture look legitimate.  But

again, Plaintiffs do not assert that Wells Fargo concealed a fact or that they did not know facts and

instead claim only that they did not understand the legal significance of the forfeiture term.

Accordingly, the court finds that California's discovery rule does not delay the accrual of Plaintiffs'

breach of contract claim.

**C.  California's Equitable Doctrines Do Not Change the Outcome**

Plaintiffs also argue that the statute of limitations is subject to equitable tolling and that Wells

Fargo should be equitably estopped from raising the statute of limitations as a defense.  The next

sections address these "distinct doctrines."  *Lantzy v. Centex Homes*, 31 Cal. 4th 363, 383 (Cal.

2003).

*1.  Equitable Tolling Does Not Apply*

Tolling is "is concerned with the point at which the limitations period begins to run and with the

circumstances in which the running of the limitations period may be suspended."  *Id.*  It is a judge-

made doctrine that suspends or extends a statute of limitations "as necessary to ensure fundamental

1    practicality and fairness." *Id.* at 370-71.  In *Lantzy*, the California Supreme Court explained that it

2    has applied equitable tolling "in carefully considered situations to prevent the unjust technical

3    forfeiture of causes of action, where the defendant would suffer no prejudice." *Id.*  The effect of

4    equitable tolling is that the limitations period stops running during the tolling event and begins to

5    run again only when the tolling event has concluded.  *Id.*  The tolled interval is tacked onto the end

6    of the limitations period, thus extending the deadline for the lawsuit by the length of time of the

7    tolling event.  *Id.*

8        A defendant's fraudulent concealment of a cause of action can toll a statute of limitations, and

9    the tolling lasts as long as the plaintiff's reasonable reliance on the misrepresentations.  *See Grisham*

10   *v. Philip Morris U.S.A., Inc.*, 40 Cal. 4th 623, 637 (Cal. 2007) (citation omitted).  But "[a]

11   defendant's fraudulent concealment tolls the statute of limitations only when, as a result of that

12   concealment, the plaintiffs fails to discover some critical fact." *Goldrich v. Natural Y Surgical*

13   *Specialties, Inc.*, 25 Cal. App. 4th 772, 784 (Cal. Ct. App. 1994) (citation omitted).  Equitable tolling

14   also can apply if a person has several legal remedies and in good faith pursues one.  *See Elkins v.*

15   *Derby*, 12 Cal. 3d 410, 414 (Cal. 1974); *see also* Rylaarsdam & Turner, CAL. PRAC. GUIDE: CIV.

16   PRO. BEFORE TRIAL—STATUTES OF LIMITATIONS § 6:5 (The Rutter Group 2014) (equitable tolling

17   has been applied by California courts in several circumstances, including while a plaintiff is

18   pursuing an alternative remedy in another forum and while a defendant fraudulently conceals the

19   cause of action).

20       Here, Wells Fargo did not conceal a critical fact that prevented Mr. Stonhaus from learning all of

21   the facts underlying his breach of contract claim.  As discussed in the last section, Mr. Stonhaus

22   knew the Plans' requirements and knew that Wells Fargo forfeited his Award under the forfeiture

23   agreement when he went to work for a competitor.  He had the "critical facts" that he needed to file

24   his lawsuit. *See Kay v. Wells Fargo & Co., N.A.*, No. C 07-01351 WHA, 2007 WL 2141292, at *5

25   (N.D. Cal. July 24, 2007) (where Wells Fargo disclosed all of the critical facts underlying a RESPA

26   claim but did not admit to putative class members that it was violating RESPA, the court declined to

27   equitably toll—albeit under federal law—the statute of limitations for the putative class members

28   who, unlike the named plaintiff, fell outside of the limitation period; the plaintiff failed to explain

1  how she was able to discover the RESPA-violating scheme but all other similarly situated people

2  were unable to do so).

3        If a plaintiff knows all facts underlying his breach of contract claim but does not know that those

4  facts establish a legal violation, then it is not appropriate to apply equitable tolling.  To hold

5  otherwise renders a statute of limitations irrelevant any time a plaintiff knows the facts but does not

6  know that the conduct is illegal.  *See McCarn v. HSBC USA, Inc.*, No. 1:12–CV–00375–LJO–SKO,

7  2012 WL 5499433, at *6 (E.D. Cal. Nov. 13, 2012).  It also would entitle "any plaintiff who requires

8  the assistance of counsel to discover the existence of a claim, including plaintiffs who conduct

9  virtually no diligence, . . . to equitable tolling of the statute of limitations for an indefinite period of

10  time until that plaintiff retains counsel." *Id.*  The threshold to trigger equitable tolling is very high,

11  "lest the exception swallow the rule." *Id.* (quoting *Porter v. Ollison*, 620 F.3d 952, 959 (9th Cir.

12  2010)).

13        Plaintiffs' argument – that Wells Fargo wrapped its Plans in official language and used its own

14  good reputation to put one over on its employees – does not change the outcome.  Its Plans look

15  official because they are official, and they are meant to provide a benefit to its employees.  If the

16  Plans have an illegal provision, then that provision subjects Wells Fargo to a lawsuit, but it does not

17  operate to toll the statute of limitations.

18        Plaintiffs' other cited cases do not change this conclusion.  It cites several cases for the

19  proposition that employers cannot put illegal provisions into contracts and argues that Wells Fargo

20  similarly and purposefully subverted the FAs' rights to their money and to pursue other

21  employment.  *See* Motion, ECF No. 47 at 17 (citing *Armendariz v. Foundation Health Psychare*

22  *Servs. Inc.*, 24 Cal. 4th 83, 124 n.13 (2000); *Hill Med. Corp. v. Wycoff*, 86 Cal. App. 4th 895, 901

23  (2001); *Kolani v. Gluska*, 64 Cal. App. 4th 402, 407 (1998); *Baker Pac. Corp. v. Suttles*, 220 Cal.

24  App. 3d 1148, 1155 (1990); *Latona v. Aetna U.S. HealthCare*, 82 F. Supp. 2d 1089, 1096-98

25  (1999)).  These are merits arguments that Wells Fargo has liability if it has illegal provisions in its

26  Plans and agreements.  The cases do not support an argument that overt, illegal contract provisions

27  toll the statute of limitations.

28

### 2. Equitable Estoppel Does Not Apply

Equitable estoppel comes into play only after the limitations period has run and addresses "the circumstances in which a party will be estopped from asserting the statute of limitations as a defense to an admittedly untimely action because his conduct has induced another into forbearing suit within the applicable limitations period." *Lantzy*, 31 Cal. 4th at 381.  Equitable estoppel is "wholly independent of the limitations period itself and takes its life . . . from the equitable principle that no man [may] profit from his own wrongdoing in a court of justice." *Id.* (citations and quotations omitted).  It is "the venerable principle that '[o]ne cannot justly or equitably lull his adversary into a false sense of security, and thereby cause his adversary to subject his claim to the bar of the statute of limitations, and then be permitted to plead the very delay caused by his course of conduct as a defense to the action when brought.'" *Id.* at 383 (quotations and citations omitted).  Thus, "[a] defendant will be estopped to assert the statute of limitations if the defendant's conduct, relied on by the plaintiff, has induced the plaintiff to postpone filing the legal action until after the statute has run." *Honig v. San Francisco Planning Dep't*, 127 Cal. App. 4th 520, 529 (Cal. Ct. App. 2005) (citation omitted).  "The defendant's statement or conduct must amount to a misrepresentation bearing on the *necessity* of bringing a timely suit; the defendant's mere denial of *legal liability* does not set up an estoppel." *Lantzy*, 31 Cal. 4th at 384 n.18 (emphasis in original) (citations omitted).

Here, Plaintiffs argue that Wells Fargo fraudulently concealed Mr. Stonhaus's breach of contract and induced him to forego filing an action within the statute of limitations by (1) making "official announcements" about its high ethical standards and "doing what's right," (2) including the forfeiture agreement in the Plans, which "appeared to be proper and official," and (3) "lying" in the brochures, prospectuses, and other notices about the Plans.  Opposition, ECF No. 57 at 22 (citing Wakefield Decl., ECF No. 50 ¶¶ 11-19, Ex. 6; Stonhaus Decl., ECF No. 51 ¶¶ 6-10, 14-15, Ex. 19F).  Plaintiffs "believed and relied on [Wells Fargo's] assurances and code of ethics and made no claim because of [Wells Fargo's] conduct." *Id.* (citing Wakefield Decl., ECF No. 50 ¶¶ 10-14; Stonhaus Decl., ECF No. 51 ¶¶ 12-13, Ex. 12A-F).  Plaintiffs also suggest that the Plans' provision stating that it is governed by ERISA is part of the cover-up to make the Plans' forfeiture provision look enforceable because ERISA preempts the state anti-competition laws that render the forfeiture

1    provision void.

2    Absent statements or similar conduct by Wells Fargo that concealed the forfeiture agreement or

3    its forfeiture of Awards, the court declines to construe the Plans' existence and Wells Fargo's

4    marketing of them to its employees as behavior meriting equitable estoppel.  Wells Fargo repeatedly

5    and openly disclosed the forfeiture agreement, it did not hide that it forfeited the Awards pursuit to

6    it, and FAs knew about the Plans' provisions about forfeiture.  Nothing suggests that Plaintiffs were

7    lulled into inaction or induced to forego filing a lawsuit.  There was no interference with Mr.

8    Stonhaus's bringing a timely suit that might bar Wells Fargo from invoking the statute of limitations.

9    Equitable estoppel requires more than a sophisticated financial services firm's open distribution of

10   its official plans to its managers and highly-compensated employees and its subsequent enforcement

11   of those plans' explicit conditions for forfeiting unvested compensation.  Wells Fargo's wrapping its

12   incentive programs in its good name and allegedly high ethical standards does not change this

13   outcome.

14   Plaintiffs also argue that Wells Fargo continued its bad behavior by keeping money from FAs,

15   even after the 2012 plan change that eliminated forfeitures for FAs in California and North Dakota,

16   and by failing to inform class members of the plan changes.  Opposition, ECF No. 57 at 18-19.  This

17   does not change the conclusion that Wells Fargo did not conceal the forfeiture provisions or the

18   forfeitures.

19   Also, misrepresentations of law generally provide a basis for equitable estoppel only if there is a

20   fiduciary duty or confidential relationship between the parties." *Kennedy v. Wells Fargo Bank, N.A.*,

21   No. C-11-0675 MMC, 2012 WL 2792933, at *3 (N.D. Cal. July 9, 2012) (citing *Jordan v. City of*

22   *Sacramento*, 148 Cal. App. 4th 1487, 1496-97 (Cal. Ct. App. 2007)); *see* Rylaarsdam & Turner,

23   CAL. PRAC. GUIDE: CIV. PRO. BEFORE TRIAL—STATUTES OF LIMITATIONS § 7:35 (The Rutter Group

24   2014).  Plaintiffs do not assert that such a relationship exists, and there are no facts in the record that

25   suggest that there is.  *See Odorizzi v. Bloomfield School Dist.*, 246 Cal. App. 2d 123, 129 (Cal. Ct.

26   App. 1966).

27                                          **CONCLUSION**

28   Viewing the evidence in the light most favorable to Plaintiffs, the court finds that their

UNITED STATES DISTRICT COURT
For the Northern District of California

C 13-05053 LB
ORDER

23

1   declarations and evidence show only a mistake of law and do not establish a genuine issue of

2   material fact to defeat Wells Fargo's partial summary judgment motion.  Thus, the court holds that

3   Plaintiff William Stonhaus's eighth claim for relief is time barred under California Civil Code §

4   3426.4 because Wells Fargo forfeited his deferred compensation before September 26, 2009.

5   **IT IS SO ORDERED.**

6   Dated: October 9, 2014

    _____
    LAUREL BEELER
7   United States Magistrate Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28